```
1
2        UNITED STATES DISTRICT COURT
         DISTRICT OF OREGON
3        PORTLAND DIVISION
         ------------------------------------------X
4        ADIDAS AMERICA, INC, a Delaware corporation;
         ADIDAS AG, a foreign entity; ADIDAS
5        INTERNATIONAL MARKETING B.V., a foreign
         entity; REEBOK INTERNATIONAL LTD, a
6        Massachusetts corporation; and REEBOK
         INTERNATIONAL LIMITED entity, a foreign
7        entity,
                                      Plaintiffs,
8
            -against-   No. 3:15-cv-02113-SI
9
         TRB ACQUISITIONS LLC, a New York limited
10       liability company, CUTIE PIE BABY, INC., a
         New York corporation, ELITE PERFORMANCE
11       FOOTWEAR, LLC, a New York limited liability
         company, GINA GROUP LLC, a New York limited
12       liability company, ONE STEP UP, LTD., a New
         York limited company, SARAMAX APPAREL GROUP,
13       INC., a New York corporation, UNITED LEGWEAR
         COMPANY, LLC, a New York limited liability
14       company, ACTIVE BASICS LLC, a New York
         limited liability company USPA ACCESSORIES,
15       LLC DBA CONCEPT ONE, CONCEPTS, LLC, a New
         York limited liability company, IMX, LLC, a
16       New York limited liability company, KIDZ
         CONCEPTS, LLC, a New York limited liability
17       company, Q4 DESIGNS LLC, a New York limited
         company RBX.COM, LLC, a New York limited
18       liability company, C.D.B. BRANDS LLC, a New
         York limited liability company, and LA KIDZ
19       INC., a New York corporation,
20                                    Defendants.
         ------------------------------------------X
21
                      JEFFREY TEBELE
22              September 29, 2016
                New York, New York
23
24   Reported by: Gilbert Bowles
25   Job No. 113307
```

Page 30

1                          J. TEBELE

2          Q.    To Arent Fox?

3          A.    Yes.

4          Q.    At that point your involvement

5    stopped?

6          A.    Correct.

7          Q.    Do you recall when you first met

8    with TRB or with Arent Fox regarding the

9    collection of documents in this case?

10         A.    It was the end of '15 or

11   early '16.  I'm not sure exactly.

12         Q.    And do you recall what

13   specifically they asked you to do?

14         A.    To collect documents and e-mails.

15         Q.    And they -- and they provided you

16   with the list of these ten or so names?

17              MR. ROMAN:  Objection to form.

18         A.    Yeah.

19         Q.    Was there anyone else within TRB

20   who was involved in collecting documents?

21         A.    Not that I'm aware.

22         Q.    So then is it accurate that you

23   have access to everyone's e-mails and

24   everyone's folders?

25         A.    Yeah.

1                      J. TEBELE

2         Q.    Does TRB have any kind of

3    document-retention policy?

4         A.    No.

5         Q.    Is there any kind of informal

6    document-retention policy?

7         A.    No.

8         Q.    Is there any reason that you know

9    of that TRB employees purge or delete or get

10   rid of e-mail or documents?

11        A.    No.

12        Q.    They generally keep everything.

13        A.    Yeah.

14        Q.    Do you know how TRB communicates

15   with its licensees?

16             MR. ROMAN:  Objection to form.

17        A.    E-mails, telephones, in person.

18        Q.    Are there any letters between TRB

19   and its licensees?

20        A.    Not that I'm aware.

21        Q.    But in the ordinary course of

22   business, TRB uses e-mail to communicate with

23   its licensees?

24        A.    Yeah.

25        Q.    And specifically, I would like to

1                         J. TEBELE

2          A.     I'm not sure.

3          Q.     Active Basics?

4          A.     I'm not sure.

5          Q.     CDB?

6          A.     I'm not sure.

7          Q.     And you said before that you

8     believe that TRB has presentations to or from

9     its licensees that it keeps in its document

10    management system?

11         A.     I'm not sure.  I would imagine so.

12         Q.     Who would know that?

13         A.     Whoever creates the presentations.

14    I don't know.

15         Q.     Who would know -- or who would

16    have e-mail communication with TRB licensees?

17         A.     Julie.

18                MR. ROMAN:  What's the last name?

19                THE WITNESS:  I'm not sure.

20         A.     Ely.

21                MR. ROMAN:  Say the whole name,

22         please.

23         A.     Ely Yedid, probably Nina Critti,

24    probably Jerry Yoskowitz.  But I'm not sure

25    on those two.  But Julia and Ely definitely.

1                       J. TEBELE

2           Q.   Do you know how often or what the

3      frequency of e-mail communication is between

4      TRB and its licensees?

5                MR. ROMAN:   Objection to form.

6           A.   Regularly.

7           Q.   Regularly; so like every day?

8           A.   I don't know that exact frequency

9      but often.

10          Q.   So weekly at least?

11          A.   I would imagine so.

12          Q.   What about faxes, does TRB ever

13     use faxes?

14          A.   Not that I'm aware.

15          Q.   Do you know how TRB gets

16     information related to its royalties from its

17     licensees?

18                MR. ROMAN:   Objection to form.

19                Also, just note for the record,

20           it's outside the scope of the 30(b)6.

21          A.   I'm not sure.

22          Q.   Do you know that they get sales or

23     other information related to royalties from

24     their licensees?

25                MR. ROMAN:   Same objection.

1                           J. TEBELE

2          A.    I don't go through people's

3     e-mail, so I only go there when there's a

4     problem.  But I would imagine so, but I'm not

5     sure.

6          Q.    Have you ever seen any kind of

7     royalty report or any other kind of sales or

8     financial information from TRB's licensees?

9          A.    No.

10               MR. ROMAN:  Objection to form.

11         Q.    I'm sorry --

12         A.    No.

13         Q.    How does TRB maintain its

14    financial records?

15               MR. ROMAN:  Objection to form.

16         A.    I believe in the -- Dynamics is

17    the name of the program, and Excel.

18         Q.    Can you tell me what Dynamics is?

19         A.    It's a financial package made by

20    Microsoft.

21         Q.    How long has TRB used it?

22         A.    I'm not sure exactly.  I'm

23    guessing about a year.

24         Q.    About the time they switched over

25    from the 365 to Gmail?

1                      J. TEBELE

2        A.    I'm not sure exactly.

3        Q.    It would have been, you think,

4   sometime in 2015?

5        A.    Again, I'm not sure exactly, but I

6   would say about then.

7        Q.    Can you describe for me what it is

8   that Dynamics does; does it simply house

9   financial information, or what function does

10  it perform?

11       A.    It's an accounting package, so

12  general ledger, financial stuff like that.

13       Q.    That would include sales data,

14  profits data, that sort of thing?

15            MR. ROMAN:  Objection to form.

16       A.    Profit, yes.  Sales, I'm not sure

17  if they use it for that.

18       Q.    Do you know how they keep track of

19  sales?

20       A.    No.

21       Q.    Do you know how they keep track of

22  inventory or sales of units of products?

23       A.    No.

24       Q.    Do you know how they keep track of

25  dollar amounts of sales?

1                      J. TEBELE

2          A.    From what I understand, Dynamics.

3          Q.    And do you understand where or how

4    TRB tracks royalty payments that it's owed

5    from its licensees?

6          A.    From what I understand, Dynamics.

7          Q.    So just to be clear, it's your

8    understanding that TRB maintains its royalty

9    records, anything related to royalty

10   payments, et cetera, and its licensees in the

11   Dynamics software.

12              MR. ROMAN:  Objection to form.

13         A.    I believe so.  I'm not sure.

14         Q.    Who would know that?

15         A.    Nina.

16         Q.    What's her title briefly?

17         A.    She serves controlling function,

18   controller.

19         Q.    And then you mentioned in -- well,

20   one other question on Dynamics:

21              When TRB switched over to

22   Dynamics, what did it use prior to Dynamics?

23         A.    Just spreadsheets.

24         Q.    Just Excel spreadsheets?

25         A.    Yeah.

Page 38

J. TEBELE

1

2    Q.    And when it made that switch to

3    Dynamics sometime in 2015, did it import data

4    prior to that transition into the Dynamics

5    system?

6    A.    I don't know.

7    Q.    You may have just answered my next

8    question, but does -- separate and apart from

9    the Dynamics, does TRB use Excel for its

10   financial records?

11   A.    I think so.

12   Q.    So they -- so right now they keep

13   records both in Excel -- let's take an

14   example.

15           So for records for 2016, do they

16   keep financial records both in Excel and in

17   Dynamics?

18   A.    I would imagine so.

19   Q.    But you don't know for sure?

20   A.    I don't know for sure.

21   Q.    Who would know that; would that be

22   Nina?

23   A.    Yeah.

24   Q.    That was yes?

25   A.    Yes.

                        J. TEBELE

1
2        Q.    But prior to the switch to

3   Dynamics in 2015, it kept all of its

4   financial records simply in Excel files?

5        A.    Yes.

6        Q.    When you went to collect documents

7   for this case in response to Exhibits 1

8   through 3, did you collect financial records

9   in Dynamics and/or Excel?

10        A.    Excel, yes; and whatever reports

11   were created from Dynamics, yes.

12        Q.    Did you run reports from Dynamics?

13        A.    No.

14        Q.    Do you know that someone ran

15   reports from Dynamics in response to

16   Exhibits 1 through 3?

17        A.    Yeah.  Well, I don't know what

18   1 through 3 is, but --

19        Q.    Well, the exhibits in front of you

20   that -- document requests and interrogatories

21   from the plaintiffs in this case.

22        A.    Yeah.

23        Q.    They did run financial reports

24   from the Dynamics in response to Exhibits 1

25   through 3.

Page 40

J. TEBELE

1        A.    I'm not sure.

2        Q.    Who would know whether reports

were run in Dynamics in response to

Exhibits 1 through 3?

        A.    Ely or Nina, or Jerry.

        Q.    And were Excel files pulled, as

part of TRB's document collection efforts in

this case, in response to Exhibits 1

through 3?

        A.    It provided all files.

        Q.    So you provided all files that

were in the individuals' folders that you

named.

        A.    Correct.

        Q.    Separately from that, did you go

specifically and collect Excel files that

reflected financial records if they weren't

within those individuals' folders?

        MR. ROMAN:  Objection to form.

        A.    Repeat the question?

        Q.    So I understand that you collected

all the folders and e-mail files from the ten

people you mentioned before, right?

        A.    Um-hum.

Page 41

                    J. TEBELE

1

2         Q.    Yes?

3         A.    Yes.

4         Q.    Separate and apart from that, did

5    you go and collect any Excel files that

6    contained financial records of TRB that were

7    not within those folders?

8         A.    All the files are in those

9    folders.

10        Q.    So all the financial records are

11   within those folders.

12        A.    The Excels.

13        Q.    They are.

14        A.    Yeah.

15        Q.    Whose folders specifically would

16   they be in?

17        A.    I would imagine Jerry and Nina.

18        Q.    What's Jerry's title?

19        A.    Financial CFO.

20        Q.    Does TRB put out any kind of

21   annual or monthly financial statement?

22        A.    I'm not sure.

23        Q.    Does it have any annual or monthly

24   expense report or cost report?

25        A.    I'm not sure.

1                          J. TEBELE

2    how that process took place?

3         A.    Using a copy.

4         Q.    Was the USB drive connected

5    directly to the server, or was it done

6    remotely, or how was it done?

7         A.    Connected to the server.

8         Q.    Connected directly to the server?

9         A.    Yeah.

10        Q.    And then with respect to the

11   Google Drive, how were those documents

12   collected?

13        A.    They were exported off of Google

14   Drive.

15        Q.    How were they exported off of the

16   Google Drive?

17        A.    I'm not sure.

18        Q.    Did you give any kind of

19   instruction to your employee as to how to

20   export them off of the Google Drive?

21        A.    I believe he used the Google Drive

22   app to download it to the computer and then

23   copied it.

24        Q.    Do you know when that took place?

25        A.    Sure.  January, February, March.

1                    J. TEBELE
2              MR. HOOKER:  Okay.  Well, we can
3         stick within the scope of those.
4    BY MR. HOOKER:
5         Q.    So with respect to customers and
6    retail accounts, does anyone at TRB
7    communicate with customers and retail
8    accounts with respect to anything having to
9    do with the RBX logo, the RBX mark, or
10    stripes on the wearer apparel?
11              MR. ROMAN:  Again, that would have
12         to be outside the scope, because
13         anything that has to do with it, it's
14         about the mark, the logo, and then the
15         stripes on -- I believe the words used
16         are apparel and footwear.  So that would
17         be within the scope.  Anything outside
18         of that is outside the scope of that
19         notice.
20         Q.    So I will ask my question, and we
21    can turn back to whether it's within or
22    outside the scope, but I believe it's within
23    the scope:
24              Do TRB employees communicate by
25    e-mail with customers or retail accounts that

Page 67

1                         J. TEBELE

2      relate, as they relate to use of the RBX

3      mark, the RBX logo, or stripes on footwear or

4      apparel?

5           A.    Yes.

6           Q.    They do?

7           A.    Um-hum.

8           Q.    Do you know how often or with what

9      frequency they do?

10          A.    On logo and mark, often.  And on

11     stripes, no one recalls anything about

12     discussing stripes on products.

13          Q.    When you say "often," daily or

14     weekly?

15          A.    I guess not -- I don't know about

16     daily but -- because it's based on product

17     releases from all my conversations.  So

18     around product releases.

19          Q.    Okay.

20                How often do product releases

21     occur?

22          A.    From what I understand, regularly,

23     and then stop and start.  But there is

24     different categories and different --

25     different categories are different seasons,

```
 1                        J. TEBELE
 2      and some are not seasonal.  So I guess,
 3      adding it all up, it could be frequent, maybe
 4      weekly or monthly.  I don't know exactly.
 5           Q.    Who would know that?
 6           A.    Ely or Julie.
 7           Q.    Ely or Julie?
 8           A.    Yeah.
 9           Q.    Does -- do TRB employees
10      communicate with any advertising or marketing
11      agency regarding the RBX logo, the RBX mark,
12      or stripes on footwear or apparel?
13           A.    I was told that they had some
14      marketing company in the past, so yes.  But I
15      don't know frequency and how often or how
16      recent.
17           Q.    Do you know how long ago?
18                 It sounds like they no longer have
19      this marketing.
20           A.    I think it was either marketing or
21      web company.  I'm not sure.
22           Q.    Who would know the answer to that?
23           A.    Julie or Ely.
24           Q.    Do you know when they ceased using
25      that marketing or advertising or web design
```

1                          J. TEBELE

2      that bear the RBX logo, the RBX mark, or

3      stripes?

4                  MR. ROMAN:  Objection to form.

5          A.    Could you repeat the question?

6          Q.    Yeah.

7                  Does TRB or any of its employees

8      have e-mail communications with any party or

9      person who has any role in designing its

10     products that bear the RBX mark, the RBX

11     logo, or stripes?

12                 MR. ROMAN:  Same objection.

13         A.    Yes, on logo and mark.  And again,

14     stripes, no one recalls discussing anything

15     about stripes, so...

16         Q.    So with respect to logo and

17     design, do you know what's the frequency of

18     those communications and who they are with?

19         A.    Licensees.

20         Q.    So licensees have a role in

21     designing product?

22                 MR. ROMAN:  Objection to form.

23         A.    I don't know, but I know that

24     there is an approval process for whatever

25     gets created, so -- and the logo comes into

```
1                           J. TEBELE
2       that.
3             Q.    Okay.
4                   And the approval process is with
5       the licensees?
6             A.    Yeah, from what I understand.
7             Q.    And do you know the frequency of
8       those e-mail communications?
9             A.    Often.  I don't know exactly.  And
10      again, around product releases and shipments.
11
12            Q.    And your understanding of how
13      often product releases, it is that they are
14      seasonal, and they may happen with some
15      frequency in addition to seasonal changes and
16      products; is that right?
17                  MR. ROMAN:  Objection to form.
18            A.    I'm not really sure.  Like
19      specific frequency, I'm not really sure.
20            Q.    Do you know if TRB had any e-mail
21      communications with any party or person
22      around the design of the RBX logo?
23            A.    Yes.
24            Q.    And who would that have been with?
25            A.    Licensees.
```

Exhibit V - Page 18 of 25

1                    J. TEBELE

2        Q.    Anyone else, any -- did they have

3    any other third-party person or firm that

4    helped them design that logo?

5        A.    Not that I'm aware of.

6        Q.    But the licensees had some input

7    on that?

8            MR. ROMAN:  Objection to form.

9        A.    The licensees, from what I

10   understand, were instructed -- were provided

11   instructions about logo and trademark on

12   products.

13       Q.    Okay.

14            And those related to how to use

15   it, where to put it, that kind of thing?

16       A.    Correct.

17       Q.    Do you know one way or the other

18   whether licensees had any input on the design

19   of the logo itself?

20       A.    No.

21       Q.    You don't know?

22       A.    From everything I saw, it was

23   one-way communication on the use of the logo.

24       Q.    Do you know if invoices, either

25   from or to TRB, relating to use of the RBX

1                          J. TEBELE

2      the plaintiffs?

3          A.    I don't know exactly how many

4      e-mails, but we just made a call to the

5      forensic company that we gave the data to,

6      and we were able to find out about how much

7      we gave or how much we collected.

8          Q.    Okay.

9                And what was that number?

10         A.    Roughly, give or take, around

11     300 gig.

12         Q.    And that's all, then, that's from

13     all the collections you did --

14         A.    I believe so.

15         Q.    -- from all the custodians.

16         A.    Yeah.

17         Q.    What's the name of the forensic

18     company?

19         A.    I'm not sure.

20         Q.    But that's an outside vendor --

21         A.    Correct.

22         Q.    And were they -- were they

23     involved after the documents were collected,

24     or were they involved in the collection

25     process itself?

1                         J. TEBELE

2              So we received 11 documents that

3      had Julie Jacobs as the custodian.

4              A.    Okay.

5              Q.    Do you think you collected

6      probably a good bit more than 11 documents

7      from her?

8                   MR. ROMAN:   Objection to form.

9              A.    So Julie came in when the Box

10     system came in, so it's possible that a lot

11     of it happened through that.

12             Q.    Her documents would be in the

13     Box.com account?

14             A.    Well, her correspondence with

15     those -- whoever she corresponded with on

16     those matters would have just happened

17     through the process of Box.

18             Q.    By "Box," you mean Box.com?

19             A.    Yeah.

20             Q.    Okay.

21              I want to go through one more

22     thing with you.  If you would look at this

23     first exhibit that I gave you, the one marked

24     Exhibit 1, if you will turn to page 4 in the

25     document and look at the top of that page

Page 109

1                       J. TEBELE

2      where it says, "Request for Production

3      Number 2," it says:  "Documents that refer or

4      relate to TRB's design, selection, or

5      adoption of any disputed three-stripe

6      design."

7                Do you know if any documents were

8      collected that were responsive to this

9      request?

10          A.    Again, we didn't, like, pick and

11     choose, so we gave everything for those named

12     people to the e-discovery folks.

13          Q.    Okay.

14                If you will turn over with me to

15     page 6, and look in the middle of the page:

16     "Request for Production Number 14:  Documents

17     sufficient to identify the date of first sale

18     by TRB of any product bearing a disputed

19     three-stripe design mark."

20                Same question:  Do you know if any

21     documents were collected that were responsive

22     to that request?

23                MR. ROMAN:  Objection to form.

24          A.    It's going to be the same answer:

25     Like we didn't -- we just gave everything.

Exhibit V - Page 22 of 25

1                    J. TEBELE

2           Q.    Okay.

3                 If you will turn with me to

4     page 7, up toward the top:  "Request for

5     Production Number 18:  Documents that refer

6     or relate to the quality, durability, or

7     performance characteristics of each disputed

8     product, including documents that refer or

9     relate to any testing, investigation, or

10    study that TRB conducted or had conducted."

11                Do you know if any documents were

12    collected or responsive to that request?

13          A.    Again, we gave whatever we had.

14          Q.    Okay.

15                Do you know if -- if anyone at TRB

16    specifically sought out documents relating to

17    the quality of any of its products?

18                MR. ROMAN:  Objection to form.

19          A.    Say that again?

20          Q.    Do you know if anyone at TRB

21    specifically sought out or went to collect

22    documents that related to the quality of its

23    products?

24                MR. ROMAN:  Same objection.

25          A.    Do I know of any TRB employees did

Exhibit V - Page 23 of 25

1                          J. TEBELE

2       what about the quality of their product?

3            Q.    Did they search for any documents

4       that related to the quality or lack of

5       quality of their products?

6                 MR. ROMAN:  Objection to form.

7            A.    Did they search for them?

8            Q.    Did they.

9            A.    I'm not sure.

10           Q.    You just don't know one way or the

11      other.

12                MR. ROMAN:  Objection to form.

13           A.    I don't know if they searched.

14           Q.    If you will turn the page to

15      page 8, and we'll look at these two together.

16      So the bottom of page 8, Document Request

17      Number 26, asked for:  "Documents sufficient

18      to identify the geographic areas in which

19      each disputed product has been permitted,

20      distributed, sold, or offered for sale."

21                And then the following request,

22      Request Number 27, on the next page says:

23      "Documents sufficient to identify each store,

24      website, or other outlet through which each

25      disputed product has been sold or offered for

Page 112

1                          J. TEBELE

2        sale."

3                    Do you know if TRB searched for

4        documents that showed where, either

5        geographically or through what stores, its

6        products --

7                    MR. ROMAN:   objection.

8            Q.    -- were sold?

9                    MR. ROMAN:  Objection to form.

10       Asked and answered.

11           A.    I don't know if someone searched

12       for something, if that's your question.

13           Q.    Okay.

14                   So if I went through the remainder

15       of these document requests and the document

16       requests in Exhibit 2, you would have the

17       same answer for all of those, you don't know

18       one way or the other whether specific --

19           A.    Searches were made.

20           Q.    -- searches were made or efforts

21       were made to collect specific documents, you

22       just know what you said so far, which is that

23       you collected all the documents from all the

24       TRB employees.

25           A.    Correct.