# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ADIDAS AMERICA, INC.**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**TRB ACQUISITIONS LLC**, *et al.*,<br><br>Defendants. | Case No. 3:15-cv-2113-SI<br><br>**OPINION AND ORDER**<br>**(PUBLIC VERSION; REDACTED)** |

Stephen M. Feldman, PERKINS COIE LLP, 1120 NW Couch Street, Tenth Floor, Portland, OR 97209; R. Charles Henn Jr., Charles H. Hooker III, and Nichole D. Chollet, KILPATRICK TOWNSEND & STOCKTON LLP, 1100 Peachtree Street, Suite 2800, Atlanta, GA 30309. Of Attorneys for Plaintiffs.

Kenneth R. Davis II, LANE POWELL PC, 601 SW Second Avenue, Suite 2100, Portland, OR 97204; Michelle Mancino Marsh, Allen G. Reiter, Lindsay Korotkin, Alissa F. Bard, and Phaik Lin Goh, ARENT FOX LLP, 1301 Avenue of the Americas, Floor 42, New York, NY 10019. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

The Court is filing two versions of this Opinion and Order. In the public version,

Defendants' attorney-client communications are redacted. An unredacted version will be filed

under seal, but will be available to Plaintiffs and Defendants and their counsel as "Confidential"

under the terms of the First Amended Protective Order entered in this case (ECF 98).

Defendants requested that the Court review *in camera* 134 documents withheld from production by Plaintiffs as either privileged or subject to the work-product doctrine. The Court ordered that Plaintiffs provide a sample of 26 documents (20 percent of the total number requested by Defendants) for *in camera* review. After reviewing the documents *in camera*, the Court submitted questions to Plaintiffs, because the Court's *in camera* review raised concerns regarding the crime-fraud exception to privilege and the veracity of the answers given at depositions by Plaintiffs' corporate-representative witnesses designated under Rule 30(b)(6) of the Federal Rules of Civil Procedure.

Plaintiffs filed a response to the Court's questions, and Defendants requested the opportunity to file a brief in response to Plaintiff's filing, which the Court allowed. Plaintiffs' then filed a reply to Defendants' filing. In total, the parties filed 258 pages on this issue (in addition to the documents submitted *in camera*), and incorporated by reference numerous other filings in the record. Thus, the Court has a significant record on which to make its findings. For the reasons discussed below, the Court finds that the crime-fraud exception applies to certain documents withheld on the basis of privilege and thus those documents are not privileged and must be disclosed to Defendants.

## STANDARDS

### A. Crime-Fraud Exception

Under the crime-fraud exception, documents subject to the attorney-client privilege "are not privileged when the client consults an attorney for advice that will serve him in the commission of a fraud or crime." *In re Grand Jury Investig.*, 810 F.3d 1110, 1113 (9th Cir. 2016) (quotation marks omitted); *see also United States v. Zolin*, 491 U.S. 554, 563 (1989) ("It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the

purpose of getting advice for the commission of a fraud or crime." (citation and quotation marks omitted)).

A party asserting the crime-fraud exception first must establish "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572. Only a "minimal showing" is needed to satisfy this threshold step. *United States v. Christensen*, 828 F.3d 763, 800 (9th Cir. 2015).

A party invoking the crime-fraud exception must then satisfy a two-part test to make a *prima facie* case that the crime-fraud exception applies:

> First, the party must show that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme. Second, it must demonstrate that the attorney-client communications for which production is sought are sufficiently related to and were made *in furtherance of* [the] intended, or present, continuing illegality.

*In re Grand Jury*, 810 F.3d at 1113 (quotation marks omitted) (emphasis and alteration in original); *see also In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus. v. Carpenter*, 558 U.S. 100 (2009). "The attorney need not have been aware that the client harbored an improper purpose," nor must the planned crime or fraud "have succeeded for the exception to apply." *In re Napster*, 479 F.3d at 1090. The burden of proof by a party in a civil case seeking disclosure under the crime-fraud exception of documents protected by attorney-client privilege or the work-product doctrine is preponderance of the evidence. *Id.* at 1094-95.

## B. Trademark Renewal

Renewal of a trademark is governed by §§ 1058 and 1059 of the Lanham Act (the "Act"). 15 U.S.C. §§ 1501, *et seq*. Renewal requires the submission of an affidavit that must assert,

among other things, that the mark is "in use in commerce" and describe the goods and services in

connection with which the mark is in use in commerce. 15 U.S.C. § 1058(b)(1)(A)-(B). The term

"use in commerce" is defined by the Act as:

> The term "use in commerce" means the bona fide use of a mark in
> the ordinary course of trade, and not made merely to reserve a right
> in a mark. For purposes of this chapter, a mark shall be deemed to
> be in use in commerce--
>
> (1) on goods when--
>
> (A) it is placed in any manner on the goods or their containers or
> the displays associated therewith or on the tags or labels affixed
> thereto, or if the nature of the goods makes such placement
> impracticable, then on documents associated with the goods or
> their sale, and
>
> (B) the goods are sold or transported in commerce.

15 U.S.C. § 1127

Although the terms "bona fide" and "ordinary course of trade" are not defined in the Act,

the Ninth Circuit, in the context of the considering the term "bona fide" under § 1127, has noted

the dictionary definitions of "made in good faith; without fraud or deceit" and "sincere;

genuine." *Electro Source, LLC v. Brandess-Kalt-Aena Grp., Inc.*, 458 F.3d 931, 936 n.3 (2006)

(quoting *Black's Law Dictionary* at 186 (8th ed. 2004)). Thus, the Ninth Circuit has focused on

the good faith of the use, in addition to the use being in the ordinary course of trade. *See id.*

at 938-39 (quoting *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th

Cir. 1970)). The Ninth Circuit has also noted, however, that use simply to maintain a trademark

is insufficient because otherwise "the requirement of good faith commercial use would be read

out of the trademark law altogether." *Id.* at 939 n.6 (quoting *La Societe Anonyme des Parfums le

Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1273 n.10 (2d Cir. 1974) (discussing a "trademark

maintenance program" in the context of "minimal sales effort"); *see also id.* at 940 (noting that a

court can consider, among other factors, the "genuineness" of the use (quoting *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001)).

## C. Fraud on the PTO

"Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (quoting *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir.1986)). There must be intent to mislead the U.S. Patent and Trademark Office ("PTO") , and even a material misrepresentation will not constitute fraud if it is made based on a misunderstanding, a mistake, a negligent omission, an inadvertence, and the like. *Id.* Thus, there is a difference between a "fraudulent misrepresentation," which involves an intent to deceive, and a "false representation," which may not have the requisite scienter. *Id.* "In other words, deception must be willful to constitute fraud." *Id.*

"A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof." *Id.* The party must prove fraud "to the hilt with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Id.* (quotation marks omitted).

## BACKGROUND

An owner of a trademark is periodically required to file with the PTO affidavits or declarations of use with the PTO. One of these is due between the fifth- and sixth-year anniversaries of the registration of the trademark. 15 U.S.C. § 1058(a)(1) ("Section 8 Declaration"). The owner is, however, given a six-month grace period after the sixth-year anniversary. 15 U.S.C. § 1058(a)(3).

Reebok registered the RBK mark at issue in this case on March 28, 2006. Thus, Reebok's Section 8 Declaration timeframe for that mark ran from March 28, 2011 (the fifth-year

anniversary) to March 28, 2012 (the sixth-year anniversary). On March 10, 2012, Angelo Notaro, outside counsel for Reebok, emailed May Rodal, an in-house paralegal at adidas B.V., copying Dana Barmagen, an attorney at adidas B.V., Erica Han, Reebok's Trademark Counsel, and an "NMPC Mailbox."[1] Mr. Notaro reminded Ms. Rodal that the RBK Section 8 Declaration normal expiration date was March 28, 2012, and noted that he had not received any instructions for the mark. On March 22, 2012, Ms. Han, who as Reebok's Trademark Counsel was responsible for trademark applications and renewals of existing applications, responded to all, stating: ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ Reebok had not used the RBK mark physically on any product since about 2010.

In May 2012, Reebok employees sent emails with the subject line "RBK trademark issue." These emails discussed resurrecting an old RBK logo, using the graphics team to create a "tight" version of the logo, noting that the logo must be approved by the legal department, and noting the plan that the logo would be placed on stickers and the stickers would be applied to the inside lid of some product boxes. One employee expressed concern that there needed to be a

████████████████████████████████████████████████████████

███████████████████████ The logo was designed and approved sometime in May or June 2012. Reebok employee Richard Dilando asked Trademark Counsel Erica Han on June 13, 2012, whether ████████████████████████████████████████████████

████████████████████████████ Reebok was strategic with what product boxes on which it would place the stickers, deciding to place the stickers on the boxes of "retro products."

---

[1] The Court is not aware of what "NMPC" stands for.

The plan that was put in place to meet the requirement for a Section 8 Declaration was to use an RBK sticker on footwear, apparel (t-shirts), and accessories (hats). If the stickers were not able to be placed on any given product, then Reebok would implement "Plan B," which would be to "create the ecom site and have product available for purchase through that." This plan was confirmed in a July 13, 2012 email, which described the plan for the "RBK renewal for Sept. 28th."

Reebok employees wanted to ensure that they met the necessary requirements for the Section 8 Declaration, including that they ███████████████████████████████████ The email correspondence included subject lines such as "POs needed for Trademarks," "RBK Trademark," "Important-POs needed for Trademarks," and "Invoices for RBK Trademark Products Jimmy Jazz 62925." Reebok's plan was implemented very quickly to meet the Section 8 Declaration grace period deadline. Indeed, it was done so quickly that costs were not able to be captured as done in the normal course of business. Rob Foster, a Reebok employee, requested general ledger codes to charge the first sticker production run, noting that "because this was done quickly for the first pos in production the spec change cost wasn't captured."

Other problems arose because of the rushed timeline. Reebok ran into particular difficulty with the hats. In a July 25, 2012 email, Tim Whalen noted that because of "rushed production" Reebok could not retroactively add RBK stickers to hats. Hats apparently fell through the cracks, and, as noted in a September 21, 2012 email from Jen Maitland, this ███████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████ Thus, for hats, at the last minute Reebok had to use its "Plan B" of an "ecom" site.

No contemporaneous emails or other documents that the Court reviewed *in camera*, that were provided by Reebok, or that were cited from previously-filed documents in the record, discuss goodwill in the RBK mark, brand equity, future planned use of the RBK mark, or any similar topic. The only discussion among Reebok and adidas employees in the contemporaneous documents in the record related to the trademark and how to meet the legal requirements necessary not to lose the trademark.

## DISCUSSION

### A. Crime-Fraud Exception

#### 1. Threshold Step of the Crime-Fraud Exception

Plaintiffs first argue that Defendants do not meet the first step of the crime-fraud exception, raising sufficient factual evidence to warrant an *in camera* review. The Court disagrees. First, the Court notes that it was already conducting an *in camera* review when the Court became concerned about the crime-fraud exception. Defendants previously had raised the crime-fraud exception and although the Court resolved Defendants' motion on other grounds, the Court stated: "If, however, during the Court's limited *in camera* review of the documents ordered for *in camera* review, it appears to the Court that the crime-fraud exception may apply, the Court may revisit this portion of Defendants' motion." Plaintiffs offer no authority for the position that a court should overlook evidence of fraud or other crimes uncovered during a later *in camera* review or even during an *in camera* review conducted for other purposes.

Second, even if Defendants were required to establish a sufficient basis before the Court could conduct an *in camera* review, the Court finds Defendants have met this burden. When arguing the crime-fraud exception applied, Defendants incorporated by reference earlier briefing and arguments relating to the "sticker" program. This is the program put in place in mid-2012 to allow Reebok to file its Section 8 Declaration, and is the program the Court finds is not a good

faith, bona fide, commercial use of the RBK mark. Defendants' argument and evidence relating to the sticker program demonstrate the "good faith belief by a reasonable person that an *in camera* review of the materials may reveal evidence" to establish the crime-fraud exception. *Zolin*, 491 U.S. at 572. Thus, Defendants have met the "minimal showing" required to satisfy the threshold step. *Christensen*, 828 F.3d at 800.

### 2. Bona-Fide Use in the Ordinary Course of Trade

Plaintiffs next argue that the crime-fraud exception does not apply because the 2012 sticker program constituted good faith, bona fide commercial use of the RBK mark. Plaintiffs assert that the sticker program (and the Plan B "ecom" site) were not implemented "merely" to reserve a right in the RBK mark, but to leverage the goodwill of the mark and to identify certain goods from the Classic line as associated with the mark to benefit from the brand equity in the mark. These arguments are unavailing.

Plaintiffs rely solely on current deposition testimony to support these arguments, and offer not a single contemporaneous document discussing these purported purposes of using the mark. All of the contemporaneous documents focus solely on meeting the legal requirements so as not to lose the trademark. There is not a single discussion or hint that Reebok is interested in anything other than maintaining the mark.

Further, much of the deposition testimony relied on by Reebok is not specific or is unclear as to timeframe and could easily have been referring to a period after the 2012 renewal. For example, Plaintiffs rely on the testimony of Todd Krinsky. Mr. Krinsky testified that RBK stickers are *currently* on some product box lids, such as Iverson shoes. ECF 180-14 at 2-3. Mr. Krinsky is then asked:

> Q:    Earlier you testified that the RBK logo appears on some shoe boxes.

A:      Uh huh.

Q:      Is that correct?

A:      Yes.

Q:      And what was the purpose in putting it there?

A:      I think we felt there certainly is still equity with the RBK mark and we wanted to attach it to some of our—in association to some of our products, namely the products that kind of we felt the consumer buying those products knew about RBK, so things like Iverson, Pump, things like that.

*Id.* at 5-6. Plaintiffs contend that this testimony relates to 2012, but the questioning appears to relate to Mr. Krinsky's earlier testimony regarding *current* use of RBK stickers on product boxes. The testimony is unclear because both the questions and answers switch between past and present tense.

Regardless, the fact that when Reebok decided to place stickers on the inside of product box lids to ensure it did not lose its trademark Reebok was strategic about what products to place those stickers on, does not make the sticker program bona fide use. Placing the stickers on the products where it made the most sense from a marketing perspective is not evidence that Reebok designed or implemented the program for a bona fide commercial use. Doing the "least harm" commercially while meeting the legal requirements of trademark use is not bona fide use in the ordinary course of trade. If Reebok truly intended to "leverage the goodwill" and "benefit from the brand equity" of the mark, then why were the stickers placed on the inside of the lid of the box instead of the outside of the box where potential buyers could readily see the mark?

Reebok's argument that its use of the RBK mark is a classic use of a mark to identify goods is unpersuasive. Customers were not purchasing RBK goods, and the goods were not identified as RBK goods. Customers were purchasing, for example, Iverson shoes. These shoes were advertised as Iverson shoes, sold as Iverson shoes, invoiced as Iverson shoes, packaged as

Iverson shoes, marked as Iverson shoes on the product itself, and then happened to have an RBK sticker put on the inside of the lid of the product box. The sales, thus, did not depend on the RBK mark for identification of source. This is not brand identification, even for a mark with significant goodwill and brand equity. *Exxon Corp. v. Humble Expl. Co.*, 695 F.2d 96, 100-02 (5th Cir. 1983) (noting that "[n]o sales were made that depended upon the HUMBLE mark for identification of source. . . . That is, the HUMBLE mark did not with these sales play the role of a mark" because the products were Exxon products on which the HUMBLE mark was placed on select invoices or products, and concluding that, even though the mark had goodwill of "immense value," the sales were not bona fide use).

Other testimony relied on by Plaintiffs is general testimony regarding the importance of the RBK mark, its general brand equity, general statements regarding whether Reebok intended to "abandon" the mark, and vague intentions around the possible future use of the RBK mark. But this type of testimony is again not date specific and is not specific as to the purpose of the 2012 sticker program at the time it was created and implemented. ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████

The Court provided Reebok the opportunity to respond to the Court's concern regarding the crime-fraud exception. Reebok did not provide any contemporaneous documents with its response. Defendants filed a reply to Plaintiffs' filing and argued, among other things, that Plaintiffs offered no contemporaneous documents supporting Plaintiffs' theories of additional

purposes for the sticker program. Plaintiffs' were permitted a response to that filing. Plaintiffs again did not file any contemporaneous documents from 2012. Plaintiffs pointed only to the fact that Reebok was strategic in the products on which it placed its stickers.

Erica Han, Reebok's former Trademark Counsel, submitted a declaration in response to the Court's concern regarding the crime-fraud exception. Ms. Han noted that she did not review any documents and that her declaration was based on her recollection of events from 2012.[2] Ms. Han testifies that she recalls that Reebok employees believed the RBK mark was important to their business plan and wanted to have a section of the "e-commerce" site branded with the RBK mark. Ms. Han's recollection is not consistent with the contemporaneous documents, which indicate that use of the e-commerce site was "Plan B" to the sticker program to preserve the trademark. Further, the emails discussing having to use the e-commerce site at the last minute in September 2012 because stickering was not done on the hats express frustration and displeasure, not that it was an intentional decision made because the RBK mark was important to the business plan.[3]

Ms. Han also recalls that the sticker program was a "running change," meaning that it would continue beyond the 2012 renewal. She further states that based on her standard practice, she would not have authorized the submission if trademark preservation was the "sole" purpose

---

[2] Ms. Han expressed concern regarding potential privilege waiver based on the Court's earlier ruling relating to privilege waiver for documents provided to a witness designated under Rule 30(b)(6) of the Federal Rules of Civil Procedure to prepare that witness to testify on designated topics at a deposition under Rule 30(b)(6). The Court notes that Ms. Han would not have been reviewing documents as a Rule 30(b)(6) witness.

[3] The Court's recitation is not intended to impugn Ms. Han's veracity. The Court understands that Ms. Han is testifying regarding events of six years ago, without the benefit of reviewing documents to refresh her recollection.

of the use of the mark on the packaging. Finally, she states that she would have confirmed that the stickers were on a sufficient quantity to constitute bona fide use.

The Court does not question the sales volume. This is not a case where only token sales were made to ensure trademark preservation or renewal. The Court acknowledges that the stickers were placed on products boxes having significant sales. The issue here is whether the sticker program (with the back-up plan of the e-commerce website) was put in place only to preserve the trademark or for other additional good faith, bona fide, commercial reasons.

The contemporaneous documents reviewed by the Court are clear and convincing. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Reebok then used the six-month grace period to design and implement a program to place stickers on the inside of certain product boxes to ensure that Reebok could meet the legal requirements to file a Section 8 Declaration. When the sticker program was erroneously not implemented on hats, Reebok had to resort to its "Plan B" program of an "ecom" internet sales site at the last minute. The Court finds that the program was not designed and implemented for any purpose other than to try to ensure that the trademark would not be lost. This is not good faith, bona fide use in the ordinary course of trade.[4] *See Electro Source.*, 458 F.3d at 938-40, n.6; *see also Grocery Outlet Inc. v. Albertsons, Inc.*, 2008 WL 5245962, at *7 (N.D. Cal. Dec. 17, 2008) ("However, the evidence is persuasive that such signage was erected solely on the advice of counsel for the purpose of maintaining an active registration in the mark. Such usage is not considered active use in the ordinary course of trade.").

---

[4] The Court makes no finding relating to any later statement of use, or whether Reebok's plans for the RBK mark changed after the 2012 Section 8 Declaration.

Although Ms. Han testifies in her current declaration that she would not have authorized the submission of the Section 8 Declaration if trademark preservation was the sole purpose, ███

██████████████████████████████████████████████████████████████████████

████████████████████████████ There is no evidence that Ms. Han made any effort or investigation to confirm that trademark renewal was not the sole purpose. For example, Reebok did not submit any email or other documentation from 2012 provided to Ms. Han explaining to her any commercial purpose for the sticker program other than trademark preservation. Ms. Han's testimony in her declaration is about her general practice with respect to trademark filings. She does not provide specific evidence relating to the purposes of Reebok's 2012 sticker program. For example, she does not testify as to what the purported bona fide commercial use was, what investigation she conducted to learn of the bona fide use, how she learned of that use, or what evidence supports that use. The Court finds the specific documentation of the 2012 program clear and convincing and that it outweighs the statements of Ms. Han regarding her general practice relating to trademark filings.

### 3. Fraud on the PTO

Plaintiffs argue that even if the 2012 sticker program was not bona fide use, the 2012 Section 8 Declaration submitted relating to the RBK mark did not constitute fraud on the PTO for two reasons. First, Plaintiffs argue that because it was submitted by outside counsel, and outside counsel believed it was true, the high bar to prove fraud on the PTO is not met. Second, Plaintiffs argue that because Ms. Han is the person who directed outside counsel to file the Section 8 Declaration, and Ms. Han believed it to be true, there was no fraud. Both arguments fail for the same reason—it is not merely the subjective knowledge and intent of counsel that the Court considers.

The Court has no reason to believe that outside counsel had any knowledge relating to Reebok's sticker program. Regarding Ms. Han's knowledge, in her recently-filed declaration, she makes general statements regarding her understanding of trademark law, her ethical standards, and the fact that she would not submit or cause to be submitted a declaration to the PTO that was false or contained false statements. She further states that she believed all of the statements in the 2012 Section 8 Declaration submitted to the PTO relating to the RBK mark were true and that she did not intend to deceive the PTO with any statements contained in that declaration. As noted above, there is no evidence before the Court that Ms. Han conducted any reasonable investigation into whether Reebok's 2012 sticker program was done for the sole purpose of retaining the trademark or for good faith, bona fide, commercial purposes. Thus, the Court does not conclude that Ms. Han had specific knowledge that the 2012 sticker program was done for the sole purpose of meeting the legal requirements of the Section 8 Declaration. Whether Ms. Han was willfully ignorant, however, is not a question that the Court needs to resolve, because Reebok is the registrant and Reebok had the requisite knowledge.

Plaintiffs argue that the Court should only consider the intent of the declarant (outside counsel), or possibly the person responsible for the filing and who directed outside counsel, Ms. Han. Plaintiffs primarily rely on *In re Bose* for this proposition. That case, however, states that "we hold that a trademark is obtained fraudulently under the Lanham Act only if the *applicant or registrant* knowingly makes a false, material representation with the intent to deceive the PTO." 580 F.3d at 1245 (emphasis added). Moreover, the Ninth Circuit has described the elements for fraud on the PTO as:

> 1) a false representation regarding a material fact; 2) the *registrant's* knowledge or belief that the representation is false; 3) the *registrant's* intent to induce reliance upon the misrepresentation; 4) actual, reasonable reliance on the

misrepresentation; and 5) damages proximately caused by that reliance.

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1019 (9th Cir. 2018) (emphasis added). As stated above, the "registrant" here is Reebok. Further, from a policy standpoint, it makes little sense to consider only the signatory's knowledge and intent. Under Plaintiffs' approach, a registrant could engage in fraudulent conduct but keep outside counsel in the dark, and would then be able to engage in fraud on the PTO with impunity. The Court thus considers Reebok's knowledge and intent, not just outside counsel's or Ms. Han's.

The Court also rejects Plaintiffs' argument that the Court must identify a specific Reebok employee that had fraudulent intent. *See Meckatzer Lowenbrau Benedikt Weib Kg*, 95 U.S.P.Q.2d 1185 (T.T.A.B. May 13, 2010) ("We do not read *In re Bose* as requiring that a party identify a 'specific individual' who 'knew of the withheld material information or of the falsity of the material misrepresentation, and withheld or misrepresented this information with a specific intent to deceive the PTO,' as respondent argues."). All of the Reebok employees involved in the 2012 sticker program knew it was for purposes of preserving the RBK mark instead of a good faith, bona fide use in the ordinary course of trade. Those employees implemented the program to meet the legal requirements to file a Section 8 Declaration.

Despite the fact that the sticker program was not bona fide use, the Section 8 Declaration states that Reebok's use of the RBK mark was bona fide use. That statement was material, it was false, it was knowingly false, it was made with the intent that the PTO would rely on it and continue the registration of the RBK mark, and it was made with the intent to deceive the PTO because Reebok knew that if the PTO was aware that the use was not bona fide, the PTO would not allow the registration to continue. Thus, by clear and convincing evidence, the Court finds fraud on the PTO relating to the 2012 Section 8 Declaration submitted by Reebok for the RBK

trademark, for purposes of the Court's crime-fraud exception analysis.[5] Accordingly, all documents withheld for privilege relating to the renewal of the mark, the sticker program, and other related issues are found to be not privileged and thus must be promptly produced.

## B. Plaintiffs' Witnesses Designated Under Rule 30(b)(6)

In addition to expressing concern regarding the crime-fraud exception, the Court expressed concern regarding whether certain testimony of witnesses designated under Rule 30(b)(6) of the Federal Rules of Civil Procedure comported with documents the Court reviewed *in camera*, or whether Reebok would want to supplement or change any testimony. Plaintiffs responded that Reebok would not supplement or change any testimony, but adidas did clarify one point in testimony relating to TRB's watch notices. Plaintiffs also offered to allow Defendants to add the watch notice topics to already-scheduled re-opened depositions. Defendants may do so if they wish.

The Court, however, has some concern with Plaintiffs' response regarding the Rule 30(b)(6) testimony relating to abandonment. Reebok's Rule 30(b)(6) witness testified with respect to the RBK mark that "we have not identified any gaps in time when that mark wouldn't have been in the marketplace in one form or another." ECF 363-2 at 4. ██████████████ ███████████████████████████ As then-Trademark Counsel, presumably Ms. Han made a good-faith investigation whether the RBK was in the marketplace such that Reebok could file the Section 8 Declaration. ████████████████████████████████████

---

[5] The Court does not intend this finding to have any preclusive affect. This finding is not critical or necessary to any judgment the Court may ultimately render in this case. For issue preclusion (also known as collateral estoppel), three factors must be considered: "(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated [by the party against whom preclusion is asserted] in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action." *Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996).

█████████████████████████████████████ Because, however, the Court

has found that document not to be privileged, Defendants will have full use of the document,

consistent with the First Amended Protective Order, including to impeach the Rule 30(b)(6)

testimony. The Court, thus, makes no further order regarding this issue.

## CONCLUSION

The Court finds the crime-fraud exception applies to documents concerning the 2012

Section 8 filing relating to the RBK mark. All documents relating to that filing, including

documents relating to whether Reebok could file at the sixth-year anniversary, the sticker

program, the e-commerce backup plan, and the ultimate filing at the close of the six-month grace

period are not privileged and must be promptly produced. Plaintiffs, however, may elect to

designate these documents as "Confidential," but not "Attorneys' Eyes Only," under the First

Amended Protective Order (ECF 98).

**IT IS SO ORDERED**.

DATED this 25th day of September, 2018.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge